# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **BEDFORD NISSAN, INC., MMN, LLC,** ) | **CASE NO.  1:16 CV 423** |
| **d/b/a Mentor Nissan, MD Auto Group, LLC** ) | |
| **d/b/a I-90 Nissan and Nissan of North** ) | |
| **Olmsted, LLC,** ) | **JUDGE DAN AARON POLSTER** |
| ) | |
| **Plaintiffs,** ) | |
| ) | **OPINION AND ORDER** |
| **vs.** ) | |
| ) | |
| **NISSAN NORTH AMERICA, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

Before the Court is Defendant Nissan North America, Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint.  (**Doc ##: 25, 26** ("Motion").)  This action stems from Nissan North America's ("Nissan NA") practice of forming secret alliances with select preferred dealers and providing them with cash and quarterly incentive payments that are not available to all dealers.[1]

Plaintiffs herein are four Nissan dealers in Northeast Ohio who allege that Nissan NA entered such agreements with Bernie Moreno.  Moreno owns and operates two of eight authorized Nissan dealerships in the Cleveland Metropolitan Market, and all three Infiniti dealerships in Northeast Ohio.  Plaintiffs contend that the secret cash and quarterly incentive payments that Nissan NA has made (and continues to make) to Moreno <u>alone</u> violates Section 2(a) of the Robinson-Patman Act along with other state and federal statutes, and gives rise to breach of contract and fiduciary duty claims.

---

[1]Plaintiffs assert that they first learned of Nissan NA's covert preferred-dealer strategy from an article published in *Automotive News* on February 8, 2016.

The Court has reviewed the Motion, Plaintiffs' Memorandum in Opposition (Doc ##: 30, 31), Defendant's Reply Memorandum (Doc ##: 34, 35 ("Reply")), Plaintiffs' Notice of Supplemental Authority (Doc #: 36), and Defendant's Response to Plaintiffs' Notice of Supplemental Authority (Doc #: 37).  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the pending Motion.

## I.

Nissan NA is a licensed manufacturer and distributor of new Nissan motor vehicles and other related products through a nationwide network of independently owned and operated dealers.  (Doc #: 20 ("Amended Complaint" or "Am. Comp.") ¶ 8.)  Plaintiffs are four authorized Nissan dealers in Northeast Ohio, commonly referred to as Bedford Nissan, Mentor Nissan, I-90 Nissan, and Nissan of North Olmsted.  (Id. ¶¶ 4-7.)  This case involves a series of secret financial agreements Nissan NA entered with Bernie Moreno, owner and president of Bernie Moreno Companies ("Moreno").  (Id. ¶ 25.)  Moreno operates 31 car dealerships in Ohio, Massachusetts, Kentucky and Florida.  (Id.)  He owns and operates two of the eight authorized Nissan dealerships in the Cleveland Metropolitan Market, commonly referred to as Airport Nissan (or M6-Airport) and Nissan of Streetsboro (or M14-Streetsboro).  (Id.)  Moreno also owns and operates all three Infiniti dealerships in Northeast Ohio: Airport Infiniti, Infiniti of Akron, and Infiniti of Beachwood.  (Id.)

**A.      Moreno's Nissan Dealerships**

**1.      M6 Motors, Inc. d/b/a Airport Nissan**

In or about March 2012, M6-Airport purchased North Coast Nissan's dealership assets in Middleburg Heights, Ohio for $3.75 million.  (Am. Comp. ¶ 26.)   M6-Airport eventually

relocated to Brookpark Road next door to Moreno's Airport Infiniti dealership.  (Id.)  Plaintiffs assert that Nissan NA approached and enticed Moreno to amend his purchase of North Coast Nissan's dealership assets by offering him cash and incentive payments not available to other Nissan dealers in the same market.  (Id. ¶ 27.)  On May 12, 2012, Moreno and Nissan NA entered into a confidential agreement

(the "M6 Financial Agreement").  (Id. ¶ 28.)

The M6 Financial Agreement was amended on July 31, 2015 t

The closest and most direct competitors of Airport Nissan are Plaintiffs Nissan of North Olmsted, I-90 Nissan and Bedford Nissan.  (Id. ¶ 32.)

**2.      M14 Motors, Inc. d/b/a Nissan of Streetsboro**

In or about April 2014, M14-Streetsboro purchased Classic Nissan's dealership assets in Streetsboro, Ohio.  (Am. Comp. ¶ 33.)  The acquisition of Classic Nissan gave Moreno his second Nissan Northeast Ohio dealership.  (Id.)

On May 29, 2014, Moreno and Nissan NA entered into an agreement

("M14 Financial

-3-

Agreement").  (Id. ¶ 36.)

On or about the same day that Moreno acquired Classic Nissan, Mike D'Amato purchased Nick Abraham Nissan in Sheffield Village, Ohio.  (Am. Comp. ¶ 34.)  This acquisition gave D'Amato his second Nissan dealership in Northeast Ohio.  (Id.)  Despite acquiring his second Nissan dealership on or about the same date as Moreno, however, D'Amato did not receive, nor was he offered, the upfront cash and quarterly incentive payments secretly provided to Moreno.  (Id. ¶ 38.)  Indeed, Plaintiffs assert that they did not learn of Nissan NA's covert preferred-dealer practices until they read an article in the February 8, 2016 edition of *Automotive News*.

In sum, Plaintiffs allege that Nissan NA has unilaterally chosen Bernie Moreno as its preferred dealer in the Northeast Ohio market to the detriment of Plaintiffs.  (Am. Comp. ¶ 14.)  Furthermore, the unrestricted cash and sales incentive payments that Nissan NA secretly pays to Moreno quarterly effectively permit him to purchase and sell new Nissan vehicles at substantially lower prices than Plaintiffs.  (Id. ¶ 15.)  The price discrepancy is significant due to the very small profit margin on the sale of new Nissan vehicles.  (Id.)  Plaintiffs conclude that the combination of cash and quarterly incentive payments offered to Moreno alone in this market constitute illegal price discrimination because they are not available to all Northeast Ohio Nissan dealers.

Based on these allegations, Plaintiffs allege that Nissan NA has violated the Robinson-Patman Act, 15 U.S.C. § 13(a) (Count 1), several sections of the Ohio Motor Vehicle Franchise

-4-

Act codified at O.R.C. §§ 4517.59, *et seq*. (Counts 2 through 5), and the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221 *et seq*. (Count 6).  Plaintiffs also assert that Nissan NA's conduct constitutes a breach of the parties' Dealers Sale and Service Agreement (Count 7) and a breach of its fiduciary duty to Plaintiffs (Count 10).  In addition to compensatory damages, Plaintiffs seek declaratory and injunctive relief.  (Respectively, Counts 8 and 9.)

## II.

Nissan NA asks the Court to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party.  *See Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1071 (S.D. Ohio 2013) (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).  A court need not, however, credit bald assertions, legal conclusions, or unwarranted inferences.  *Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face," and not merely "conceivable."  *Twombly*, 550 U.S. at 570. The factual allegations must be sufficient "to raise a right to relief above the speculative level." *Id*. at 555.  Although Rule 12(b)(6) does not impose a probability requirement at the pleading stage, a plaintiff must present enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a cause of action.  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quotation marks omitted).  Simply reciting the elements of a cause of action does not suffice.  *Iqbal*, 556 U.S. at 678.

-5-

**III.**

**A.      Robinson-Patman Act Claim**

Plaintiffs allege that Nissan NA's price discrimination violates Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act ("RPA" or "the Act"), 15 U.S.C. ¶ 13(a).  Section 2(a) makes it "unlawful for any person engaged in commerce . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quantity . . . where the effect of such discrimination *may* be substantially to lessen competition . . . " 15 U.S.C. § 13(a) (emphasis added).  The Supreme Court has defined price discrimination as "merely a price difference."  *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 570-71 (3d Cir. 1998) (citations omitted).  "Direct discrimination occurs when a seller charges different prices to different buyers.  Indirect discrimination occurs when one buyer receives something of value not offered to other buyers." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 521 (6th Cir. 2004) (internal citations omitted).  Section 2(a) applies only if the sale of commodities of like grade and quality are made at different prices "contemporaneously or within the same approximate time period."  *Id*. (quoting Hugh C. Hansen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L. Rev. 1113, 1127-28 (1983)).

The Act protects against three categories of injury that may give rise to a Section 2(a) RPA claim.  Of relevance here is Plaintiffs' contention that Defendant has committed a secondary-line violation, to wit, a violation that occurs "when a seller's discrimination impacts competition among the seller's customers, i.e., the favored and disfavored purchasers." *Lewis*, 355 F.3d at 520 (quoting *George Haug Co. v. Rolls Royce Motor Cars, Inc*., 149 F.3d 136 (2d

Cir. 1998)).  The plaintiff who claims to be disfavored must show that it competes with the favored purchaser in the same geographic market.  *Id*. at 521 (citations omitted).

To bring a secondary-line claim under the RPA, a plaintiff must show that (1) the relevant sales were made in interstate commerce, (2) the vehicles were of like grade and quality, (3) the manufacturer discriminated in price between the favored and disfavored purchasers, and (4) the effect of such discrimination *may* be to injure, destroy, or prevent competition to the advantage of the favored purchaser.  *Volvo Trucks NA, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006) (citing 15 U.S.C. § 13(a)).  The Court finds that Plaintiffs have sufficiently alleged an RPA claim.

There is no question that the relevant sale of new Nissan motor vehicles were made in interstate commerce, the Nissan vehicles sold to Plaintiffs and Moreno were of like grade and quality, and the parties are competitors in the Northeast Ohio market for persons purchasing new Nissans.  The Court finds, with respect to the third element, that Plaintiffs have alleged, in sufficient detail to survive a motion to dismiss, the manner in which Nissan NA has engaged in price discrimination favoring Moreno, namely, in enormous cash and quarterly incentive payments totaling millions of dollars that were (and are) unavailable to Plaintiffs.

In doing so, the Court rejects Nissan NA's argument that Plaintiffs must allege facts showing that Nissan NA charged them a higher wholesale price for "specific" Nissan vehicles than it "contemporaneously" charged Defendant.  (Motion at 19.)  According to Nissan NA, unless Plaintiffs can show that Nissan NA made contemporaneous "discounted wholesale prices," "rebates," or "refunds " to Moreno that it did not make to Plaintiffs, they have failed to sufficiently allege the third price-discrimination element.  (Id.)

-7-

Nissan NA's argument ignores the settled law that price discrimination can be shown indirectly, i.e., "when one buyer receives *something of value not offered to other buyers*." *Lewis*, 355 F.3d at 521 (emphasis added).  Plaintiffs have alleged in detail that Moreno received something of value (specific amounts of cash and quarterly incentive payments tied to sales performance metrics, including dates and locations) not offered to other dealers.[2]  *See also Black Gold, Ltd. v. Rockwool Indus., Inc.*, 729 F.2d 676, 682 (10th Cir. 1984) (the RPA can only reach the terms and conditions of sale other than price *to the extent that the terms' only practical effect [is] to establish discrimination in price*, precisely the evil at which the statute was aimed."); *GE Elec. Co. v. S & S Sales Co.*, No. 1:11 CV 837, 2011 WL 4369045, at *1 (N.D. Ohio Sep. 19, 2011) (quoting *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F. Supp. 637, 647 (D. N.J. 1980)) ("[T]he Act does not prohibit all forms of discrimination among customers but only those that relate to price *or that serve as disguised price discrimination.*").

Moreover, case law shows that incentive programs tied to car sales that are offered to some but not all car dealers in a competitive market may give rise to an RPA violation.  *See, e.g., Mathew Enter., Inc. v. Chrysler Group LLC*, No. 13-cv-4236, 2016 WL 4269998, at *2, *6 (N.D. Calif. Aug. 15, 2006) (denying the defendant's motion for summary judgement involving an incentive program where there was evidence that the market was highly competitive and minor price differences caused by the program significantly affected the plaintiff's profits)); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 559-60, 562 (1981) (explaining that a sales incentive program setting the plaintiff's quota higher than competitors  may violate the RPA if

[2]These allegations alone distinguish this case from *New Albany Tractor, Inc. v. Louisville Tractors, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011), which Nissan NA cites to support its position that, following *Iqbal* and *Twombly*, the plaintiff may not use the discovery process to obtain facts about price discrimination after filing suit.

the "effect of such discrimination *may* be substantially to lessen competition."); *Rod Baxter*

*Imps., Inc. v. Saab-Scania of Am., Inc.*, 489 F. Supp. 245, 249 (1980) (reasoning that if the

"[price incentive] program was available to all competing dealers on reasonably equivalent

terms, then . . . it would not likely have had the effect of limiting competition" in violation of the

RPA).

　　　　Next, the Court finds that Plaintiffs have sufficiently alleged the fourth element, i.e.,

the effect of such discrimination may be to injure, destroy, or prevent competition to the

advantage of a favored purchaser.  *Volvo Trucks*, 546 U.S. at 177.  In *Volvo Trucks*, the Supreme

Court explained that competitive injury under the RPA may be established directly, through

evidence that sales or profits were diverted "from a disfavored purchaser to a favored

purchaser," or indirectly, through evidence that "a favored competitor received a significant

price reduction over a substantial period of time," giving rise to a presumption of competitive

injury.  *Id.* (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 49-51).  This presumption has

subsequently been referred to as the *Morton Salt* inference.  *See, e.g., Cash & Henderson Drugs,*

*Inc. v. Johnson & Johnson*, 799 F. 3d 202, 210 (2d Cir. 2015).

　　　　Here, Plaintiffs allege that the combination of cash and quarterly incentive payments

secretly offered to preferred dealers result in the subsidization of the preferred dealers' wholesale

car prices.  (Am. Comp. ¶ 50.)  As a result of Nissan NA's price discrimination, a preferred

dealer can significantly undercut a competing non-preferred dealer's retail prices with no

negative impact on its bottom line because, at the end of every quarter, the preferred dealer will

receive a quarterly incentive payment not received by the competing non-preferred dealer.  (Id.

¶ 51.)  Furthermore, the "subsidized" new Nissan motor vehicle price to preferred dealers allows

those dealers to achieve overt nationwide sales, growth and bonus incentive program payments

to the detriment of their non-preferred competitors. (Id.)  To be sure, while the complaint

allegations support an inference of injury sufficient to withstand a motion to dismiss at the

pleading stage, Plaintiffs must ultimately provide *evidence* supporting an actual injury.  *See, e.g.,*

*Drug Mart Pharmacy Corp. v. American Home Prods. Corp.*, No. 93-CV-5148, 2012 WL

3544771, at * 10 (E.D. New York Aug. 16, 2012) (on summary judgment, the disfavored

purchaser "must show that it lost customers or profits because the favored purchaser used its

favored advantage either to lower its resale prices or otherwise to attract business.")

Nissan NA argues that, even if the *Morton Salt* inference could be applied here, the most

that could be inferred from such price differences is a reduction of intrabrand competition, which

is not the "primary concern" of the antitrust laws.  (Reply at 15.)  According to Nissan NA, there

"are no allegations to suggest this is the rare case in which intrabrand competition should

predominate over interbrand competition."  (Id.)  There are several problems with this position.

First, while interbrand competition is the primary concern of the antitrust laws, it is not

the only concern – particularly when discussing secondary-line violations.  In *Volvo Trucks*, the

Supreme Court described this category of intrabrand competitive injury:

> Secondary-line cases, of which this is one, involve price discrimination that
> injures competition among the discriminating seller's customers (here, Volvo's
> dealerships); cases in this category typically refer to "favored" and "disfavored"
> purchasers.

546 U.S. at 177.  In *Volvo Trucks*, the Supreme Court held that a truck manufacturer did not

violate the RPA by offering different discounts to dealers submitting bids for custom-made

trucks to their customers because there was no actual competition between the dealers for the

same customers.  Here, there can be no doubt that Moreno is competing with Plaintiffs for the

-10-

same customers; i.e., persons purchasing new Nissans in this circumscribed market.  *See also*

*Mathew Enterprise*, 2016 WL 4269998, at *10 (N.D. Calif. Aug. 2, 2016) (where evidence that

customers tended to seek prices from a minimum of two dealers, and that a customer's choice of

dealer depends on price was sufficient to withstand summary judgment).

Second, Plaintiffs have adequately asserted that the franchise dealership structure of the

retail automobile industry breeds intrabrand competition between car dealers selling the same

cars in the same geographic market – particularly where the profit margin is so small.  Nissan

dealers in the same geographic market are also competing for new car buyers *generally*,

impacting interbrand competition in the same market.  If Nissan NA's strategy is to slowly

elevate the preferred dealers and drown out the non-preferred dealers, the consuming public will

suffer a loss to competition.

Accordingly, the motion to dismiss the RPA claim is **DENIED**.

**B.     OMVFA Claims**

Plaintiffs bring various claims under the Ohio Motor Vehicle Franchise Act (OMVFA)

codified at O.R.C. §§ 4517.59, *et seq.*

**1.     Count 2 - ORC 4517.59(A)(8) Claim**

In Count 2, Plaintiffs allege that Nissan NA's covert incentive payments to Moreno alone

violates O.R.C. § 4517.59(A)(8), which makes it illegal for any dealer to:

> Fail or refuse to make equally available to its same line-make franchisees all
> motor vehicles, motor vehicle parts, or other products manufactured for that
> line-make at the same actual price, *or to utilize any device including, but not
> limited to, sales promotion plans or programs that result in such lesser actual
> price*. . . .

Id. (emphasis added).  This section does not prohibit incentive programs that "are reasonably

available to all franchisees in [Ohio] on a proportionately equal basis and are based on the sale of individual vehicles and not increased for meeting a performance standard unless the standard is reasonable considering all existing circumstances." Id.

Plaintiffs allege that Nissan NA offered and implemented to Moreno upfront and quarterly incentive payments based on Moreno's vehicle sales that it did not offer to Moreno's competitors – all of which resulted effectively in a lesser actual price being paid by Moreno for new Nissans. *See, e.g., Brentlinger Enterprises v. Volvo Cars of NA, LLC*, No. 2:14-CV-360, 2016 WL 4480343, at *3 (S.D. Ohio Aug. 25, 2016) (finding that an incentive program was a "sales promotion plan or program" under O.R.C. § 4517.59(A)(8) because it provided an incentive to certain dealers to sell more cars and provided a payment which was directly and proportionately related to sales); *Audi of Smithtown Inc. v. Volkswagen of Am., Inc*., 924 N.Y.S.2d 773 (N.Y. Sup. Ct. Suffolk Cty. 2011), *aff'd*, 100 A.D.3d 669, 954 N.Y.S.2d 106 (N.Y. App. Div. 2d Dep't 2012), (finding, under a comparable New York statute, that an incentive program constituted a "sales promotion plan or program" because it provided monetary bonuses and incentive programs to competing franchisees based on their classification as a new dealer or an existing dealer.) Thus, based on the plain language of the statute, the cases, and Plaintiffs' allegations, the Court **DENIES** the motion to dismiss this claim.

### 2.  Count 3 - O.R.C. § 4517.59(A)(1)

In Count 3, Plaintiffs allege that Nissan NA's conduct in giving secret incentives to its preferred dealer constituted bad faith, in violation of O.R.C. § 4157.59(A)(1), which provides:

> Notwithstanding the terms and provisions or conditions of any agreement, franchise or waiver, no franchisor shall: (1) In acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith; . . .

-12-

Id.  O.R.C. § 4517.01(AA) defines "good faith" as:

> honesty in the conduct or transaction concerned and the observance of reasonable
> commercial standards of fair dealing in the trade as is defined in section 1301.201
> of the Revised Code, including, but not limited to, the duty to act in a fair and
> equitable manner so as to guarantee freedom from coercion, intimidation, or threats
> of coercion or intimidation; provided however, that recommendation, endorsement,
> exposition, persuasion, urging, or argument shall not be considered to constitute a
> lack of good faith.

Id.  The definition of "good faith" in O.R.C. § 1301.201(B)(20), Ohio's adoption of the Uniform

Commercial Code ("UCC"), provides that "'good faith' . . . means honesty in fact and the

observance of reasonable commercial standards of fair dealing."  Id.

The Ohio legislature amended § 1301.201(B)(20)'s definition of "good faith" in 2011 to

include a fair-dealing element ("2011 Amendments").  *See* Am. H.B. 9, 129th General

Assembly, Reg. Sess. (Ohio 2011).  Under the  prior definition, "'good faith' meant honesty in

fact in the conduct or transaction concerned. . . . [The 2011 Amendment] redefines 'good faith'

to mean honesty in fact and the *observance of reasonable commercial standards of fair dealing*."

Lisa Sandberg, Ohio Legis. Serv. Comm'n, *Final Analysis, Am. H.B. 9*, 129th General

Assembly, at 9 (2011) (emphasis in original).

The 2011 Amendments "[a]dopt[ed] the revisions to the general provisions . . . of the

[UCC] that were recommended by the National Conference of Commissioners on Uniform State

Laws."  Id. at 1.  The Official Comments to the UCC provides guidance as to the meaning of

"good faith" under the 2011 Amendments:

> [T]he definition of "good faith" in this section merely confirms what has been the
> case for a number of years as Articles of the UCC have been amended or revised-the
> obligation of "good faith," applicable in each Article, is to be interpreted in the
> context of all Articles except for Article 5 as including both the subjective element
> of honesty in fact and the objective element of the observance of reasonable

-13-

> commercial standards of fair dealing. As a result, both the subjective and objective elements are part of the standard of "good faith,"
>
> . . . .
>
> As noted above, the definition of "good faith" in this section requires not only honesty in fact but also "observance of reasonable commercial standards of fair dealing." Although "fair dealing" is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. This is an entirely different concept than whether a party exercised ordinary care in conducting a transaction. Both concepts are to be determined in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.

UCC § 1-201; *accord* Ohio Rev. Code Ann. § 1301.201 (West) (UCC Official Comments).

In *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 631 F. App'x 271, 273 (6th Cir. 2015) (*Franklin Park II)*, the Sixth Circuit considered whether the district court erred by applying the wrong legal standard for determining "good faith."  The plaintiff argued that the district court erred by following *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 835 (6th Cir. 1997).  *Franklin Park II*, 631 F. App'x at 273. As in *Jim White*, the district court held that a failure to act in "good faith" requires a showing of  "commercially unjustifiable" behavior. *Id.*

The Sixth Circuit in *Franklin Park II* determined that the "commercially unjustifiable" standard was properly applied.  *Id.* at 273-74.  However, the court also explained that the offense in question occurred before the 2011 Amendments added the fair-dealing element to § 1301.201(B)(20)'s definition of "good faith," and that the amendment does not apply retroactively.  *Id.* at 273.

Absent any guidance from Ohio courts or the Sixth Circuit as to how the fair-dealing element added by the 2011 Amendments changes the definition of "good faith," the Court looks to the plain language of the statute and the UCC's Official Comments, both of which are devoid

-14-

of a "commercially unjustifiable" element. Thus, "good faith"as defined in § 1301.201(B)(20) requires (1) "honesty in fact" and (2) the "observance of reasonable commercial standards of fair dealing," which indicates a concern for fairness of conduct in business practices. O.R.C. § 1301.201(B)(20); *see* UCC § 1-201; Ohio Rev. Code Ann. § 1301.201 (West) (UCC Official Comments).

Here, as explained above, Nissan NA mistakenly relies upon the holding in *Franklin Park II* that a failure to act in "good faith" will only be shown if they acted in a "commercially unjustifiable" manner. (Motion at 33.) Unlike *Franklin Park II,* where the alleged acts of bad faith occurred prior to the 2011 Amendments, the alleged acts here began in 2012. (Am. Comp. ¶ 26.) Thus, the Court rejects Nissan NA's argument that Plaintiffs must allege facts showing that Nissan NA's actions were "commercially unjustifiable and not motivated by legitimate business concerns." (Motion at 21.) Rather, to survive a motion to dismiss, Plaintiffs must allege facts that, assuming the truth of those facts, allow the Court to draw all reasonable inferences that Nissan NA was not honest in fact or did not observe "reasonable commercial standards of fair dealing." O.R.C. § 1301.201(B)(20).

Nissan NA also contends that this claim fails because the Amended Complaint does not allege facts supporting a claim "that simply by executing the Agreements [with Moreno], Nissan acted in 'bad faith' as the term is statutorily defined and interpreted." (Motion at 33.) However, Plaintiffs allege more than just conclusory statements that the Agreements with Moreno constituted bad faith. Plaintiffs expressly assert that Nissan NA covertly and unilaterally chose Moreno as its preferred dealer through its execution of the Agreements, the effect of which provided Moreno with a significant price advantage over Plaintiffs who were not given similar incentives. (Am. Comp. ¶¶ 14-15, 18-19, 46-49.) Plaintiffs further explain that "the price

-15-

differential negatively affects competition and substantially impairs Plaintiffs' ability to fairly compete . . . ."  (Id. at  ¶ 49.)

The Court finds the allegations sufficient to withstand *Iqbal/Twombly* analysis, and **DENIES** the motion to dismiss this claim.

### 3.    Count 4 - O.R.C. § 4517.59(B)

In Count 4, Plaintiffs allege that Nissan NA discriminates among its dealers via its covert incentive program to Moreno, in violation of O.R.C. § 4517.59(B)(1) which provides:

> No franchisor shall discriminate among the franchisor's dealers in any program that provides assistance to the franchisor's dealers, including internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs.

Id.  Nissan NA argues that the list of examples following the term "program" "define what the Legislature intended to regulate by § 4517.59(B)" –  despite citing three cases interpreting the term "including" as *illustrative* of the general principle.  (Motion at 28.)  Nissan NA also argues that this statute "prohibits a manufacturer from setting up a network-wide program and then discriminating among its dealers in the administration of that program," but fails to cite a single case standing for that particular proposition.

Unfortunately, there is a dearth of case law analyzing what constitutes "any program that provides assistance to the franchisor's dealers."  Nissan NA recommends that the Court interpret this statute extremely narrowly, and Plaintiffs recommend that the Court interpret this statute liberally.  Because the examples of assistance are illustrative and not exhaustive, the Court **DENIES** the motion to dismiss this claim, noting that it doesn't matter whether the upfront and quarterly incentive payments Nissan NA provided to Moreno constitute "assistance" under

-16-

§ 4517.59(B) or "sales promotion plans or programs" under § 4517.59(A)(8) as Plaintiffs can recover only one award under the OMVFA.

### 4. Count 5 – O.R.C. § 4517.59(A)(15)

Plaintiffs allege in Count 5 that Nissan NA's conduct violates O.R.C. § 4517.59(A)(15). Under O.R.C. § 4517.59(A)(15), it is unlawful for a manufacturer to engage in any predatory practice or discriminate against new motor vehicle dealers including discriminating against a franchisee:

> with regard to motor vehicle allocation, motor vehicle sales expectations, motor vehicle market penetration, motor vehicle planning volume requirements, customer service satisfaction requirements, dealership facility requirements, or dealer capitalization requirements; . . .

*Id.*

According to Nissan NA, this claim should be dismissed because the Sixth Circuit has construed the list of seven categories specifically identified in the statute as exhaustive.  (Motion at 30 (citing *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co*., 530 F. App'x 542, 550-51 (6th Cir. 2013)) (*Franklin Park I*) (dismissing a § 4517.59(A)(15) claim because dealership transfers are not identified as a regulated practice)).

Plaintiffs allege that Nissan NA violated and continues to violate § 4517.59(A)(15) by artificially deflating Moreno's vehicle sales expectations, market penetration, and planning volume requirements, thereby making it easier for Moreno to achieve certain sales performance metrics and sales bonuses not available to Plaintiffs.  (Am Comp. ¶ 100.)  As an example, Plaintiffs allege:

.

(Opp. Br. at 29-30.)

Because the Amended Complaint contains sufficient allegations in support of Count 5, the Court **DENIES** the motion to dismiss this claim.

**C.       Count 6 – Automobile Dealers Day in Court Act**

In Count 6, Plaintiffs allege that Nissan NA has forced both Matt Greenberg, principal of Bedford Nissan and Mentor Nissan, and Mike D'Amato, principal of Nissan of North Olmsted and I-90 Nissan, to abandon their positions on Nissan NA's dealer board.  According to Plaintiffs, Nissan NA's conduct in doing so has violated the federal Automobile Dealers Day in Court Act, ("ADDCA" or "the Act"), 15 U.S.C. §§ 1221 *et seq*.

The ADDCA imposes upon automobile manufacturers the duty "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise. . . ."  15 U.S.C. § 1222.  However, the Act narrowly defines the good faith duty as "the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party . . . ."  15 U.S.C. § 1221(e)).

-18-

"The Sixth Circuit has long interpreted this statute to mean that, 'in the absence of coercion, intimidation, or threats thereof, there can be no recovery [for a dealer] through the day-in-court statute, . . . even if the manufacturer otherwise acted in 'bad faith' as that term is normally used." *Epps Chevrolet Co. v. Nissan NA, Inc.*, 99 F. Supp. 3d 692, 705 (E.D. Ky. 2015) (quoting *Fray Chevrolet Sales, Inc. v. Gen. Motors Corp.*, 536 F.2d 683, 685 (6th Cir.1976)) (citations and internal quotation marks omitted) (citing *Hall v. Ford Motor Co.*, No. 94-3885, 1995 WL 619972 (6th Cir. Oct. 20, 1995)).  In *Fray*, the Sixth Circuit held that coercion or intimidation is only actionable if it includes a "wrongful demand which will result in sanctions if not complied with," or if a manufacturer offers to the dealer an "either-or" proposition.  *Fray*, 536 F.2d at 685 (citations omitted).  "The conduct must be such as would threaten a reasonable man in the dealer's position."  *Overseas Motors, Inc. v. Import Motors, Ltd.*, 375 F. Supp. 499, 544 (E.D. Mich. 1974). "It is not sufficient that a dealer 'mere[ly] ... felt [itself] coerced.'"  *Fray*, 536 F.2d at 685 (citations omitted).

Nissan NA argues that in order to plead coercion or intimidation, Plaintiffs must allege facts showing a wrongful demand.  (Motion at 21 (citing *Fray*, 536 F.2d at 685 ("Coercion or intimidation must include 'a wrongful demand which will result in sanctions if not complied with.'")).  Furthermore, "[a] wrongful demand is one that threatens to remove something to which a plaintiff has *a legal or contractual right*."  (Id.) (emphasis added) (citing examples).  The Court concludes that Plaintiff's contention that Nissan NA demanded that Matt Greenberg and Mike D'Amato dismiss this case or relinquish their positions on Nissan's Regional Dealer Advisory Board does not constitute a wrongful demand under the ADDCA.  Plaintiffs do not allege that they have a legal or contractual right to be sitting on Nissan NA's advisory board –

-19-

the composition of which is entirely up to Nissan NA in its discretion and completely outside the

dealer agreement.  It is not unlawful for Nissan NA to remove from its advisory board a dealer

that sues them.  The Court thus finds that removal from the advisory board does not constitute a

wrongful demand under the ADDCA.

The Court also rejects Plaintiffs' allegation that, "upon information and belief," Plaintiffs

have been removed from consideration for awards given by Nissan NA because of this lawsuit.

(Am. Comp. ¶ 113.)  Plaintiffs have not pointed to language in their agreement giving rise to an

entitlement to any awards.  For these reasons, the Court **GRANTS** the motion to dismiss the

ADDCA claim asserted in Count 6.

**D.      Count 7 – Breach of the Dealer Sales and Service Agreements ("DSSA")**

In Count 7, Plaintiffs allege that Section 12 of the DSSA specifies the causes for which

Nissan NA may terminate Plaintiffs' franchise rights.  (Am Comp. ¶ 117.)   Further, by

employing a discriminatory price scheme, Nissan NA seeks to eliminate intrabrand competition

among its dealers in Northeast Ohio, reconfigure its dealer network in Northeast Ohio, and

"drown the Plaintiffs," thus causing the constructive or actual termination of Plaintiffs'

franchise.  (Id. ¶ 118.)

Nissan NA argues that Plaintiffs cannot bring a valid claim for constructive termination

where they have not, in fact, been terminated, and Plaintiffs cannot genuinely allege that Nissan

NA has actually or effectively done so.  In support, Nissan NA cites *Bright Bay GMC Truck, Inc.*

*v. General Motors Corp.*, 593 F. Supp. 2d 495 (E.D.N.Y. 2009) and *L & B Truck Servs., Inc. v.*

*Daimler Trucks NA LLC*, No. 1:09-cv-74, 2009 WL 3584346 (D. Vt. Oct. 26, 2009).  In *Bright*

*Bay*, a truck dealer brought an action against the vehicle manufacturer alleging that the

-20-

manufacturer's conduct constructively terminated its franchise in violation of the New York Franchised Motor Vehicle Dealer Act, a statute that prohibits manufacturers from terminating franchise agreements absent due cause.  The dealer claimed that the manufacturer, by announcing a strategy encouraging dealers to align various brand names of automobiles in one dealership facility and refusing to give the truck dealer an automobile franchise or assist it in purchasing one, constituted a constructive termination of its franchise.  The district court disagreed, concluding that the manufacturer did not terminate the dealer's franchise because the manufacturer had not discontinued the sale of its trucks to the dealer, and the dealer still sold the trucks at its dealership and could continue to do so until the parties agreement expired.

In *L & B Trucks*, a truck dealer claimed that the manufacturer's decision to cease production of one line of trucks for which franchisee was a dealer constituted a constructive termination of the dealer's franchise, in violation of the Vermont Motor Vehicle Manufacturers, Distributors and Dealers Franchising Practices Act which prohibits vehicle manufacturers from terminating franchises absent good cause.  The district court found that there was no constructive termination because the agreement had not in fact been terminated, and the franchisor continued to give support to the dealer in ways other than supplying trucks; that is, by providing parts and service under the agreement.

Because Nissan NA has not terminated the franchise agreement, and Plaintiffs continue to operate their dealerships, the Court rejects Plaintiffs contention that Nissan NA has breached the DSSA by constructively terminating Plaintiffs dealerships.

However, Plaintiffs also allege that, in employing its illegal pricing scheme, Nissan NA has breached its implied covenant of good faith and fair dealing.  (Id. ¶ 120.)  In fact, the DSSAs

entered between Plaintiffs and Nissan NA state that "Dealer has entered into this Agreement in reliance upon Seller's integrity and *expressed intention to deal fairly with Dealer* and the Consuming Public."  (Doc #: 31-1 at 13, 14, 15 16 (emphasis added).)

The Court finds that the question of whether Nissan NA has dealt fairly with Plaintiffs under the circumstances alleged in the Amended Complaint is a fact question requiring discovery.  Accordingly, the Court **DENIES** the motion to dismiss the contract claim in Count 7.

**E.** **Count 8 – Request for Declaratory Judgment**

Plaintiffs ask the Court to declare Nissan NA's secret incentive program illegal.  As this request is literally in the form of a prayer for relief, the Court **GRANTS** the motion to dismiss Count 8 as a cause of action.

**F.** **Count 9 – Request for Temporary and Permanent Injunction**

Similarly, Plaintiffs ask the Court to enjoin Nissan NA from entering similar secret incentive programs to preferred dealers.  As this request is also literally in the form of a prayer for relief, the Court **GRANTS** the motion to dismiss Count 9 as a cause of action.

**G.** **Count 10 - Breach of the Fiduciary Duty**

In Count 10, Plaintiffs claim that Nissan NA owes them a fiduciary duty and breached it because the DSSA and franchise relationship "(1) place[s] [Nissan NA] in a position of disproportionate power and dominance over Plaintiffs, (2) require Plaintiffs to provide confidential and propriety information to [Nissan NA], creating a confidential relationship, and (3) make Plaintiffs dependent upon [Nissan NA] for economic survival, forcing Plaintiff[s] to repose special trust and confidence in [Nissan NA]." (Am Comp. ¶ 135.)  Plaintiffs also claim

-22-

that a fiduciary duty results from the obligations set forth in the OMVFA and the ADDCA.  (Id. at ¶ 136.)

Under Ohio law, the following elements must be met to prove a breach of fiduciary duty: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately there from."  *Pasqualetti v. Kia Motors Am., Inc.*, 663 F. Supp. 2d 586, 597 (N.D. Ohio 2009) (citations omitted).  Fiduciary duties in Ohio can arise by law or informally through the operation of the relationship between the parties.  *Scotts Co. v. Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 738 (S.D. Ohio 2009).  "A fiduciary relationship is defined as a relationship 'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'  A fiduciary relationship is not unilaterally created; rather, both parties must understand that a special trust or confidence has been reposed in the relationship."  *Id.* (citations omitted).

"As a general rule, franchise relationships—including those in the automotive industry—are not inherently fiduciary in nature."  *Franklin Park I*, 530 F. App'x at 546 (citing *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 652 N.E.2d 218, 231 (Ohio 1994)).  In *Franklin Park I*, the court rejected the plaintiff's claims that a fiduciary duty existed based on the obligations set forth in the franchise agreement.  *Id.* at 549.  The court reasoned, "The [franchise agreements] established a number of duties on the part of Franklin Park, but . . . they also granted the dealership a fair amount of autonomy in advertising, staffing, the purchase and sale of used cars, the ability to sell cars outside of its market area.  In short, we see nothing that

-23-

makes this a "rare instance" where a confidential relationship gave rise to a fiduciary duty." *Id.* at 548-49.

Additionally, the OMVFA and ADDCA do not establish fiduciary duties.  In *Pasqualetti,* the plaintiff claimed that a fiduciary relationship was formed under O.R.C. §§ 4517.59, *et seq*. *Pasqualetti*, 663 F. Supp. 2d at 597.  The plaintiff in *Pasqualetti* attempted to buy a Kia Motors franchise and his application to franchise was denied.  *Id.* at 589.  In assessing the defendant's motion to dismiss the fiduciary duty claims, the court explained that the defendant and plaintiff were "actors whose behavior is regulated by [O.R.C. §§ 4517.59, *et seq*], and whose interests during the application process [to franchise] are inherently in conflict."  *Id.* at 597.  Thus, the court found that a fiduciary duty was not created under O.R.C. §§ 4517.59, *et seq,* and granted the motion to dismiss the fiduciary duty claims.  *Id.* at 598.

Furthermore, Plaintiffs cannot unilaterally create a fiduciary relationship if one is not established by law:

> A party cannot, however, unilaterally elevate a relationship to a fiduciary level. "[B]oth parties must understand that a special trust or confidence has been reposed." No fiduciary relationship is created, moreover, where the parties interact at "arms length, each protecting his own interest." Under such circumstances, it would be unreasonable for either party to expect the other to act as their fiduciary.

*Id.* at 598 (alteration in original) (citations omitted).  Unless the relationship gave rise to a duty, "[a] fiduciary relationship does not exist between a franchisor and a franchisee in the absence of a statute expressly creating such a fiduciary relationship."  *Saydell*, 652 N.E.2d at 231.

Here, the parties point to no language in the DSSA creating a fiduciary relationship, and the Court is not aware of any provisions in O.R.C. §§ 4517.59, *et seq*, and 15 U.S.C. §§ 1221, *et seq,* that create a fiduciary relationship.  As in *Franklin Park*, it appears that Plaintiffs have

-24-

much autonomy in the purchase and sale of cars, and as in *Pasqualetti*, the parties here are simply regulated by O.R.C. §§ 4517.59, *et seq,* and may have differing interests and goals. Thus, a fiduciary relationship will only be created if "both parties . . . understand that a special trust or confidence has been reposed in the relationship."  *Scotts Co.*, 606 F. Supp. at 738.

Accordingly, the Court **GRANTS** the motion to dismiss the fiduciary duty claim asserted in Count 10.

**IV.**

Based on the foregoing, the Court **GRANTS** the motion to dismiss Counts **6, 8, 9, 10,** and **DENIES** the motion to dismiss all other claims.

**IT IS SO ORDERED.**

  */s/ Dan A. Polster     October 28, 2016*
**Dan Aaron Polster**
**United States District Judge**